## PALM OIL RECOVERY, INC. *v.* COMPTROLLER OF THE TREASURY OF THE STATE OF MARYLAND

[No. 367, September Term, 1971.]

*Decided June 15, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and JAMES MACGILL, Chief Judge of the Fifth Judicial Circuit, specially assigned.

*Lawrence A. Kaufman,* with whom were *Cable, McDaniel, Bowie & Bond* on the brief, for appellant.

*William J. Rubin, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented to us in this appeal is whether the Maryland Tax Court, on October 21, 1971, erred in holding the appellant, Palm Oil Recovery, Inc. (Palm Oil), a Maryland corporation, liable for sale or use taxes on the purchases of items necessary for the recovery and refining of "waste effluent rolling oil" generated at Bethlehem Steel's Sparrows Point Plant. We shall affirm.

The facts in this case have been stipulated and need be detailed only so far as is necessary in reaching the ultimate conclusion.

The Bethlehem Steel Co. uses palm oil in its rolling

mill process. In the fabrication of sheet steel, the sheets of metal are passed through a succession of rollers during which the sheets become increasingly thinner until the desired thickness is reached. The oil is poured or sprayed on this metal as a lubricant to reduce friction as the metal passes through the rolling operation. Subsequent to the contract, dated August 12, 1959, between Bethlehem Steel and Palm Oil, the residue of this oil, referred to as "waste effluent rolling oil," is collected in a reservoir from which it eventually finds its way via a piping system to appellant's plant. The basic provisions of the contract between Palm Oil and Bethlehem Steel are as follows.

By the first paragraph, Palm Oil agreed to perform all the work, including the furnishing of all materials, tools, equipment, labor, and superintendence required and a site for its facilities, necessary to recover and refine "waste effluent rolling oils" generated at Bethlehem Steel's Sparrows Point Plant. By the second paragraph, it was agreed that Palm Oil would recover at its own expense the available "waste effluent rolling oils" generated at Sparrows Point and refine as much thereof as Bethlehem Steel might specify. The third paragraph provided that for a period of one year, Bethlehem Steel shall have the option of having up to 100% of its waste oil refined at specified prices and that Palm Oil shall maintain in reserve a minimum of 500,000 pounds of refined oil. Paragraph four detailed the place of delivery of the oil, together with certain specifications of quality. By the fifth paragraph, it was agreed that Bethlehem Steel "shall retain ownership of all reclaimed oil" and that Palm Oil "will hold such oil available for the company." It was further provided that if there existed any surplus oil at the end of the contract year, Bethlehem Steel would sell this oil to Palm Oil at a specified price. The term of the Contract was for a period of one year, but is renewable from year to year unless cancelled by a written notice from either party.

The parties have further stipulated to a detailed de-

scription of the process by which Palm Oil, during the assessment period in question, performed under the Contract its obligation to convert "waste effluent rolling oils" to usable rolling oil:

"a. A solution consisting of the residue ('scums') of rolling oil which has been used by Bethlehem in the rolling of steel, along with water which has been used by Bethlehem both to cool the steel and the rollers themselves and to extend the oil, is passed out of Bethlehem's plant through pipelines to the Taxpayer's adjacent water plant. Prior to the advent of the Taxpayer's process this solution was discarded as waste.

"b. By means of air flotation in the Taxpayer's water plant the scums are floated to the top of the solution.

"c. The scums are collected and passed through a 'cooker' where they are treated with sulphuric acid (i) to dissolve out colloidal iron which was absorbed by the rolling oil during the rolling of steel and (ii) to convert iron soaps, which have been formed during the prior rolling of steel, into fatty acids. The resulting mixture is filtered to remove dirt and to break the oil-water emulsion. The filtrate settles to a raw reclaimed oil and an aqueous phase.

"d. The raw reclaimed oil contains several undesirable elements after it comes out of the cooker:

"(i) Too high a concentration of free fatty acids (FFA)

The high temperatures and pressures to which the rolling oil is submitted during the steel rolling process cause some of it to break down into free fatty acids and glycerine. The reusable rolling oil produced by the Taxpayer under the subject Contract was re-

quired to contain less than 20% free fatty acids.

" (ii) Monoglycerides and diglycerides have resulted from the hydrolysis of triglycerides—and further free fatty acids have been formed

Both during the steel rolling process and in the Taxpayer's cooker triglycerides (combinations consisting of 3 molecules of fatty acid and 1 molecule of glycerine) in the rolling oil react with the water (i.e. hydrolyze) with which the rolling oil is mixing so that either one molecule of fatty acid breaks free (leaving a diglyceride—a combination of 2 molecules of fatty acid and 1 molecule of glycerine) or two molecules of fatty acid break free (leaving a monoglyceride—a combination of 1 molecule of fatty acid and 1 molecule of glycerine). These free molecules of fatty acid add further to the undesirable concentration of free fatty acids referred to in (i) above. Moreover, the diglycerides and monoglycerides must be reconverted to triglycerides before the rolling oil is acceptable to the steel mill.

" (iii) Light weight petroleum oils

During the steel rolling process various petroleum contaminates have leaked into and dissolved in the rolling oil. These remain throughout the sulphuric acid treatment in the cooker.

"e. The raw reclaimed oil which comes out of the cooker containing the undesirable elements described in Paragraph 4 is passed through a vacuum tower wherein it is submitted to temper-

atures of approximately 500° F and the following processes take place simultaneously:

> "(i) A portion of the excess free fatty acids react with the monoglycerides and diglycerides to form the triglycerides.
>
> "(ii) Further excess free fatty acids are distilled off so as to meet the specifications of the contract.
>
> "(iii) The light weight petroleum oils are distilled off.
>
> "f. The resulting product meets the specifications of the contract for usable rolling oil."

By assessment dated September 16, 1966, and enclosed with Notice of Assessment dated September 20, 1966, the Retail Sales Tax Division notified Palm Oil of an assessment of use tax in the amount of $6,023.68 together with interest thereon in the amount of $1,099.32 and penalty in the amount of $602.37 for a total assessment of $7,725.37. Palm oil duly filed an Application for Revision on October 4, 1966, and paid $1,287.56 to the Comptroller of the Treasury, being one-sixth of the amount of the total assessment. A Claim for Refund was duly filed by Palm Oil on December 6, 1966, in respect to the payment of the $1,287.56. The claim of the taxpayer for exemption of use tax on the basis of price amounts in the total of $206,328.77 was rejected by the Retail Sales Tax Division by letter of November 3, 1967, after an informal hearing had been held. A formal hearing was held on January 18, 1968, resulting in a determination by the hearing officer, dated February 28, 1968, adverse to Palm Oil.

Palm Oil then filed on March 28, 1968, a petition of appeal to the Maryland Tax Court, alleging that the Comptroller's determination was "unlawful, unreasonable and erroneous" for the following reasons:

> "a. The Taxpayer is engaged in the fabrication and production of new tangible personal property on special order for a consideration

(Section 372(d) (2) of Article 81) which is a 'retail sale' as defined in the statute.

"b. The tangible personal property so processed by the Taxpayer and claimed to be sold by the Taxpayer to Bethlehem Steel is 'destroyed' within the meaning of such term as defined in Rule 63 (Rules and Regulations of the Retail Sales Tax Division) by the subsequent use of the personal property by Bethlehem Steel Company in the manufacturing usage of Bethlehem Steel Company.

"c. The items of chemicals listed in the assessment of the Retail Sales Tax Division and claimed to be subject to the use tax are either consumed or destroyed or contaminated to the extent that they are rendered useless or become a part of the end product in the refining process of the Taxpayer, and therefore are exempt from the tax in accordance with Rule 63 of the Retail Sales Tax Division.

"d. The testimony, together with the Stipulation of Facts (Taxpayer's Appeal Exhibit 1) proves conclusively that said chemicals and other utility items are so consumed in the manufacturing process of the Taxpayer, producing either a by-product which is sold to other customers in which case they are admittedly exempt, or a product which is sold to Bethlehem Steel and is exempt because it is consumed and used in the manufacturing process of Bethlehem Steel. The testimony conclusively shows that the steps utilized by the Taxpayer in producing and manufacturing the ultimate product that is sold to Bethlehem Steel combines both chemical and physical steps resulting in a wholly new product and not merely a 'laundering service' of an ever-remaining basic product."

The Retail Sales Tax Division of the Office of the Comp-

troller filed an Answer on April 11, 1968, alleging that Palm Oil "does not fabricate or produce new personal property, but, in fact, performs certain operations on waste oil belonging to a steel company."

It was further stipulated between the parties that the only issue any longer in dispute was the applicability of the tax to the purchases of utilities.

A hearing was held and on October 21, 1971, an opinion and order was filed by the Maryland Tax Court affirming the action of the Comptroller.

The applicable statutory provisions in this case are Article 81 of the Md. Code (1969 Repl. Vol.) § 324, dealing with the Retail Sales Tax, and § 372, dealing with the Use Tax. Although both parties agree that it would appear to make little difference in result whether the tax in question is labeled a sales or use tax, in our opinion, it is more correctly a sales tax obligation which is under dispute.

Section 324 (f) provides in relevant part:

> "(f) *'Retail sale'* and *'sale at retail'* shall mean the sale in any quantity or quantities of any tangible personal property or service taxable under the terms of this subtitle. Said term shall mean all sales of tangible personal property to any person for any purpose other than those in which the purpose of the purchaser is (i) to resell the property so transferred in the form in which the same is, or is to be received by him, (ii) to destroy the property so transferred in the manufacturing, assembling, processing or refining of other tangible personal property to be produced for sale or in the generation of electricity, or (iii) to use or incorporate the property so transferred as a material or part, o[f] other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining. . . . For the purpose of the tax imposed by this subtitle,

the term 'sale at retail' shall include but shall not be limited to the following:"

\* \* \*

"(2) Any production, fabrication or printing of tangible personal property on special order for a consideration."

\* \* \*

"(4) The sale of natural or artificial gas, oil, electricity, coal, nuclear fuel assemblies, or steam, when made to any purchaser for purposes other than resale or for use in manufacturing, assembling, processing, refining, or in the generation of electricity."

The provisions of § 372 (i) are virtually identical.

The appellant earnestly contends that under either § 324 (f) (2) or § 372 (i) (1), it is engaged in the fabrication of tangible personal property on special order for a consideration so as to fall, shifting our focus to § 324, within the definition of "retail sale" on which Palm Oil's customer would normally pay sales tax,[1] and thus the appellant would be entitled to an exemption from sales tax on its purchases of any property which are used in the rendering of such taxable services, including the utilities presently at issue.

Pursuant to the authority vested in the Comptroller by Art. 81, § 365 (a) to make and adopt rules and regulations necessary to implement the provisions of Article 81 and to define any terms used therein, Rule 81 was promulgated, and provides:

"The tax must be charged on the full selling price for the production or fabrication of tangible personal property on a special order for a consideration. This is true even though charges

---

1. Since all of the reprocessed oil is "destroyed" by Palm Oil's sole customer, Bethlehem Steel Co., in the manufacturing of other tangible personal property produced for sale, it has been stipulated that no sales tax would be imposed upon the purchase of the services in question by Bethlehem after July 1, 1966.

for labor are segregated from the cost of the materials.

"Whenever any new item is being produced the tax must be collected on the full selling price as for example, a manufacturer orders a repair part for machinery from a machine-shop—the tax must be collected on the full selling price of the part including labor.

"This rule applies with equal force to those situations where the materials are furnished by the customer and the fabrication consists wholly of labor as for example, a steel fabricator or machine shop rolling, bending, cutting, boring or punching holes, painting, or performing other services on materials furnished by the customer, if such labor is used in producing a new item.

"Some other examples are: A tailor making a suit from materials furnished by his customer; the making of drapes or slipcovers from materials furnished by the customer.

"New item means new insofar as the ultimate purchaser is concerned. The fact that work is performed by several different persons before the item is ready for use by the ultimate purchaser does not mean that the item is not a new item. Thus, all charges for bringing the item to its finished state are subject to the tax. Likewise, the cost of repairing, remodeling, or reconditioning an item is subject to the tax if a new or different item from the original is produced by such services.

*"The test to be applied is this: If the labor is expended in producing a new or different item, it is subject to the tax; if the labor is expended in repairing or altering existing property belonging to another to restore the item to its original condition, or usefulness, the tax does not apply to the labor."* (Emphasis supplied.)

Bearing in mind that the basic purpose of the structure of the sales and use taxes is to assure that somewhere along the line the State collects its tax, while avoiding a pyramiding of the tax, the theory of Rule 81 is simply that all of the services performed on special order for a consideration which go into producing a *final new product* for its first use are taxable fabrication or production. However, once the article reaches its completed form, any additional services which go into repairing or altering it so as to restore it to its original condition or usefulness and not to create a new or different item are not fabrication or production and are not subject to the tax.

The record in this case clearly indicates that Palm Oil is not engaged in the production of a final new product, but is merely restoring the product as closely as possible to its original condition or usefulness. Palm Oil attempts to impress this Court with the difference between the oil once it is used by Bethlehem and once it has been refined by Palm Oil. As noted, as a result of the usage of the oil by Bethlehem Steel, the oil becomes contaminated and several of its components are broken down and it becomes, for all practical purposes, completely unusable. After undergoing a complex process, described above, at Palm Oil's refinery, the oil, although not the equivalent of virgin rolling oil, is nevertheless reusable at certain junctures in the steel rolling process. It is therefore clear that, despite the condition of the used oil before refining and the complexity of the refining process, the end result is no more than a restoring of the product to its original condition or usefulness. Under Rule 81, which was promulgated contemporaneously with the enactment of the Sales Tax Act, this is not fabrication or production.

We have held on numerous occasions that the interpretation placed by the State Comptroller upon a taxing statute is entitled to great weight as an administrative interpretation acquiesced in by the Legislature. *See Frank J. Klein & Sons, Inc. v. Comptroller,* 233 Md. 490,

493, 197 A. 2d 243, 244 (1964); *Comptroller v. M. E. Rockhill, Inc.,* 205 Md. 226, 233, 107 A. 2d 93, 97 (1954); *John McShain, Inc. v. Comptroller,* 202 Md. 68, 73, 95 A. 2d 473, 474 (1953).

It must be admitted that we are dealing in an area where necessarily there must exist some pockets of doubt. The point at which a product becomes so changed as to become a "new or different" product is incapable of precise, rigid definition. However, where, as here, an existing product is tendered to a contractor to be altered so as to conform as closely as possible with its original state and where its utility is made to conform closely, if not identically, to its original utility, it cannot be said that what is produced is a "new or different" item as envisioned by the taxing statute and the rules authorized to implement the statute, especially in light of Section 333 of Article 81 which provides that all sales of tangible personal property and services are subject to tax until the contrary is established and the burden of proof that a sale is not taxable is upon the vendor or purchaser as the case may be.

The appellant further claims that it is entitled to an exemption on the basis of § 324 (f) (4), which provides that a sale of certain utilities, when made to any purchaser for purposes other than resale or for use in refining, shall be deemed a "sale at retail." The appellant concedes, with commendable candor, that although subsection (4) does not by its terms require that in order for the purchase of certain utilities to be exempt from tax they must be purchased for use in manufacturing, assembling, processing, or refining *other tangible personal property to be produced for sale,* the scheme of the entire statute would indicate that such was the legislative intent.[2] Appellant contends, however, that the re-

---

2. Indeed, any other construction of that provision would be incongruous and acataleptic in that it would grant an exclusion from the tax to purchasers who are "ultimate consumers," who sell no product and collect no sales taxes from their customers. As mentioned above, the overriding scheme of the sales and use tax structure as implemented by Art. 81 is to insure the proper locus of the

sale is, under § 324 (f) (2), a fabrication of tangible personal property on special order for a consideration. Since we have held that the appellant is not engaged in the fabrication of tangible personal property, this argument also must fail. It is further clear from the record that Palm Oil does not sell the refined oil to Bethlehem Steel, the contract between the parties recognizing the agreement between them as a service contract, and subsection 5 of the contract expressly stating that all ownership of the refined oil shall remain in Bethlehem Steel.

*Order of October 21, 1971, affirmed, costs to be paid by the appellant.*

tax, so as to make certain that a tax is collected while avoiding the pyramiding of taxes. As former Chief Judge Hammond stated for the Court in Comptroller of the Treasury v. American Cyanamid Co., 240 Md. 491, 494-95, 214 A. 2d 596, 597-98 (1965):

"The tax has been held to be an excise on the privilege of selling specified personal property at retail, to be collected by the vendor although paid by that purchaser who is the ultimate consumer [citing case] so as to avoid a pyramiding of the tax on the intermediate purchaser or purchasers. [citing case]"

\* \* \*

"The purchaser whose purpose is to resell the property he buys in unchanged form or as a part or component of another thing he will produce is not required to pay the tax since he is not the ultimate consumer, but, rather, the tax must be paid by the final purchaser of the unchanged article or of the manufactured, assembled, processed or refined thing. [citing case]"