# PUBLIC SERVICE COMMISSION OF MARYLAND *v.* HOWARD RESEARCH AND DEVELOPMENT CORPORATION

[No. 151, September Term, 1973.]

*Decided February 5, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Charles M. Tatelbaum, Special Counsel,* for appellant.

*Franklin G. Allen* and *Lewis S. Nippard,* with whom was *James J. Winn, Jr.,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Howard Research and Development Corporation (HRD) owns and operates the Columbia Mall shopping center in Columbia, Maryland. Opened on August 2, 1971, the Columbia Mall is an enclosed facility consisting of two major department stores and approximately 100 smaller retail stores. During development of the Columbia Mall, and when the leases were executed between HRD and its tenants, there was on file with the Public Service Commission, as there is now, an electric service tariff of the Baltimore Gas & Electric Company (BG&E) the public service company supplying the area with electricity, setting forth the terms upon which a customer of BG&E would be allowed to purchase electricity and distribute it to its own tenants. The tariff provides:

"§ 3.1 General: The Company will undertake to furnish service to the Customer, who shall be one individual, firm, corporation or organization, for use only in or on the premises owned, leased to, occupied or managed by the Customer. The service furnished may not be remetered or sub-metered by the Customer for resale.

Service furnished to the Customer may be, in turn, furnished by him to a tenant or occupant of such premises where charged for by him on one of the following bases:

  (a) As an unspecified amount, to be included as part of the rent.
  (b) As a specified amount which does not vary with the quantity of service used.
  (c) As an unspecified amount varying with the quantity of service used by the tenant or occupant as shown by the Company's indi-

vidual metering in the Customer's name, but not exceeding the charge made to such Customer by the Company."

To avail itself of the provisions of the tariff, HRD installed transformers and other electrical equipment at a cost of approximately $350,000 to enable it to reduce high voltage current to a voltage suitable for use by its tenants, and to thereafter transmit the electric current to the separate premises of the tenants. HRD made arrangements with BG&E to purchase current at a wholesale rate, and negotiated leases with each of its tenants whereby, as authorized by § 3.1 (b) of the tariff, it agreed to furnish electricity to them and to make a separate flat monthly charge to each tenant therefor, not included as part of the rent, in an amount estimated to be that which the tenant would pay to purchase electricity directly from BG&E. HRD believed that this method of distributing electricity to its tenants was more suitable than including the electricity charges in the rent, as permitted by § 3.1 (a) of the tariff, because occupants of shopping centers conduct a variety of retail businesses differing greatly in their daily consumption of electricity. Therefore, HRD thought that the charge for electricity would be more acceptable to tenants if shown as a separate figure representing the estimated consumption of that particular tenant's type of retail operation. According to HRD, in reliance upon the tariff, it negotiated long-term leases with the expectation that it would be receiving from its tenants, over the full term of the lease, a profit on the sale of the electricity which would supplement the separate amounts to be received as rent. It claimed that the leases were negotiated with full awareness on both sides that HRD would receive from the tenant not only the rent, but also a substantial profit from the electric revenues; that the tenants in Columbia Mall are mainly large national or regional retail chains that have rented stores in hundreds of shopping centers in many different states; that these sophisticated retailers knew that if the landlord of a shopping center could make a profit on the electricity sold to them, and at the same time charge them no more than they

would have to pay for the electricity from the local utility, they could allow for that profit as an appreciable credit in bargaining for what the landlord must receive as rent for the premises. By distributing electricity to its Columbia Mall tenants by the method authorized by § 3.1 (b) of the tariff, HRD realizes a profit on sales of electricity of approximately $100,000 per year.

By order dated September 14, 1972, the Public Service Commission directed that an investigation be instituted "to review the arrangements under which . . . [HRD] charges its tenants for electric service. . . ." A hearing was held on October 30, 1972 before the Commission's Chief Hearing Examiner, at the conclusion of which the examiner made these findings: that HRD buys electricity at a wholesale rate and resells it to its commercial tenants at individually specified amounts that do not vary with consumption as permitted by § 3.1 (b) of the tariff; that the electric charge made by HRD to its tenants is separately stated from the rental charge; that while the tariff provision does not limit the charge that HRD could make to its tenants, the leases between HRD and its tenants provide that the charge shall not exceed what the tenant would pay if billed direct by BG&E; that in the installation of its electric system, HRD provided check metering outlets to the tenants' premises to measure actual consumption and to provide a more accurate basis for determining the specified amount to be billed; and that the specified amount in present billings is on an adjusted basis developed by the check metering. The examiner concluded that while the method employed by HRD was in accordance with § 3.1 (b) of the tariff, it nevertheless violated The Public Service Commission Law (Maryland Code, 1969 Repl. Vol., Article 78) and necessitated modification of the provisions of BG&E's electric service tariff. The examiner noted that the terms "Electric company" and "Electric plant" were defined in sections 2 (f) and (g) of The Public Service Commission Law as follows:

"(f) 'Electric company' means and includes any public service company, other than a company generating and/or transmitting electricity

exclusively for its own use (1) which (A) owns any electric plant and (B) transmits, sells, or distributes electricity, or generates electricity for distribution or sale; or (2) any such company which is authorized to erect, lay down or maintain wires, pipes, conduits, ducts or other fixtures in, over, or under streets for furnishing or distributing electricity, or to maintain underground conduits or ducts for electrical conductors; or (3) every municipal corporation in the business of supplying electricity for other than municipal purposes.

(g) 'Electric plant' means plant owned by an electric company and includes but is not limited to batteries, boilers, buildings, cables, conduits, converters, dams, ducts (or other devices for containing or carrying electrical conductors), dynamos, easements, lamps, meters, motors, poles, power stations, real estate, services, transformers, waterfalls, water plant and water property."

From these definitions, the examiner concluded that an electric company was one which owned an electric plant and sold or distributed electricity; and that an electric plant includes transformers. By making a separate charge at a specified amount, the examiner found that HRD "sells electricity and since it owns transformers, it owns [an] electric plant." The examiner found that the arrangement under which electric service was furnished by HRD to its tenants required "a public service company status under the Public Service Commission Law"; that, in effect, the tariff permitted HRD to act as an electric company without regulation by the Commission.[1] The examiner recommended

---

1. The examiner stated: "Public service companies are not created by operations under tariff provisions of a utility with public service company status. Rather they must meet the requirements of The Public Service Commission Law. If HRD is to sell electricity, its corporate charter must provide for operation as an electric company in the City of Columbia and under Section 24(a) of The Public Service Commission Law it must obtain our permission to exercise, in the public interest, such franchise as is granted by law. Thereafter, HRD would have to comply with all of the provisions of The Public Service Commission Law including, but not limited to, rates, service, issuance of securities and reporting."

that § 3.1 (b) be modified to exclude from its operation any "customer" owning an "electric plant" and to require that the "specified amounts charged by the customer may not exceed what the tenants would pay separately or in the aggregate to the utility if billed direct." The examiner concluded with these findings:

"(1) that Section 3.1 (b) of the electric service tariff of Baltimore Gas and Electric Company can permit an arrangement that violates The Public Service Commission Law and, therefore, should be modified as hereinbefore stated; (2) that Howard Research and Development Corporation is not a public service company; (3) that the arrangement under which Howard Research and Development Corporation furnishes electricity to its tenants requires public service company status; (4) that Howard Research and Development Corporation must cease its present method of furnishing electricity as promptly as possible and utilize the provisions of Section 3.1 (a) of the said electric tariff, or Baltimore Gas and Electric Company must assume direct billing."

It was the view of the examiner that HRD would not violate the law if it utilized the provisions of § 3.1 (a) because electricity furnished to tenants under that sub-section "becomes a part of the total conveniences and necessities that a landlord decides to provide in order to attract tenants and to place them in a position where, generally, their total cost of occupancy is known." He said that "[S]uch an arrangement does not contemplate a sale of electricity" under Art. 78, § 2f.

On January 10, 1973 the Commission adopted the examiner's findings and ordered BG&E to modify § 3.1 (b) of its tariff "so that application of its provisions will not conflict with The Public Service Commission Law and that the ultimate consumer shall not pay more than if billed direct by it." The Commission directed that BG&E furnish electric service direct to the tenants at Columbia Mall "if

[HRD] does not take steps as promptly as possible to change from its present method of furnishing electricity to one that will not conflict with The Public Service Commission Law."

On February 1, 1973, HRD filed a petition of appeal and for declaratory judgment and injunctive relief in the Circuit Court of Baltimore City. It claimed that the Commission's order was erroneous "in that . . . [HRD's] sales of electricity to its tenants and only to its tenants are incidental to the landlord-tenant relationship and are therefore private, as distinguished from public, sales of electricity not subject to regulation by the . . . Commission and not constituting a violation of The Public Service Commission Law." HRD sought a declaration that its method of charging for electrical services, in its leases with its tenants, was a lawful practice and not inconsistent with the BG&E tariff. And it sought an order enjoining the Commission from interfering with its contractual rights to charge its tenants for electrical services.

The court (Ross, J.) reversed the Commission's order. It held that HRD's distribution of electricity to its tenants and its method of charging them for that service did not violate The Public Service Commission Law and, that the Commission's order requiring BG&E to modify § 3.1 (b) of its tariff, and to furnish electricity directly to the tenants in Columbia Mall, was based on an erroneous interpretation of the law. The court noted that although The Public Service Commission Law did not make a "specific or express distinction between public and private sales," it had been construed since its inception in 1910 as regulating only services provided to the public. The court said: "Public sales are regulated and private sales are not." It stated that either a "gloss" had been imposed on the statute, limiting its application to public service companies engaged in sales to the public, or that the exclusion from the definition of an "electric company" in § 2 (f) of a company transmitting electricity "exclusively for its own use" could be read to apply to the sale of electricity by a landlord to his tenants. The court held that the tariff was not illegal because HRD's sales were not made to the public; it based its decision on the

administrative and judicial construction placed upon The Public Service Commission Law in *Yeatman v. Public Service Commission*, 126 Md. 513, 95 A. 158 (1915), by the Commission's General Counsel in an opinion rendered in 1913 in the case of *In the Matter of Charles B. Clark v. Marlborough Apartment House Company*, 4 PSC 568, and the long-standing existence of § 3.1 of the tariff which had been on file with the Commission since 1929.

Appealing from the court's order, the Commission reasserts its position that § 3.1 (b) of the tariff is in violation of The Public Service Commission Law in that HRD's ownership of an electric plant and its sale of electricity to its tenants has the effect of HRD acting as an electric company and thus a non-regulated public service company. The Commission claims that because HRD is supplying electricity to over 100 of its tenants, its service is a public, and not a private one, a conclusion which it deems supported by our decision in *Yeatman v. Public Service Commission, supra.* But, it maintains, the "public v. private" use test is not the measure of the Commission's regulatory jurisdiction under the present statute. Claiming that The Public Service Commission Law "is distinctly silent on the public v. private theory," the Commission argues that we must strictly construe the statute "so as to eliminate this distinction." The Commission maintains that the legislative intent to regulate the "virtual monopoly" in services provided by public utilities, manifest in The Public Service Commission Law, is fulfilled by the regulation of HRD, which, it contends, has not only an "actual monopoly on the sale of electricity to its tenants, but [whose] sales and service incident thereto are unregulated by any public authority." It argues that "HRD is not supplying electricity to its tenants as a mere incident to its business of landlord but by its own admission it is making a profit on the transaction."

HRD contends that its activities are not subject to the Commission's regulation. It maintains that public sales of electricity are subject to regulation and that private sales are not, and that this distinction is well established in this state by a long-standing judicial and administrative

construction of The Public Service Commission Law. It argues that it has no monopoly in its sales of electricity, as those sales are made as an incident to the competitive business of the rental of commercial space.

The Commission is charged by law with the regulation of "all public service companies . . . engaged in or operating a utility business in this State." [2] The statute, and the rules and regulations promulgated by the Commission under its authority, establish prerequisites to and restrictions upon the operation of those public service companies. We hold that the requirements imposed upon public service companies by The Public Service Commission Law do not apply to the electric services provided by HRD to its tenants.

In *Yeatman*, the jurisdiction of the Commission was construed, at a time when the law was in its "embryonic state," to extend only to a public service. In that case, one Blackshere purchased a tract of land from Griffin for the purpose of constructing houses thereon. At the time of the sale there was no water supply available for the proposed houses and Griffin contracted to furnish water at a specified rate for "all the buildings, in number about one hundred" to be built by Blackshere. He constructed a water plant for this purpose, which he later sold to the Park Heights Water Company who in turn sold it to the Suburban Water Company. Fifteen of the houses built by Blackshere became the property of Yeatman. Following an order passed by the Commission setting Suburban's rates at a price greater than that specified by Griffin in the original contract, Yeatman sought to enjoin the operation of the Commission's order, arguing that the original contract between Griffin and

---

2. Maryland Code (1969 Repl. Vol.), Article 78, § 1, provides:

"The jurisdiction and powers of the Public Service Commission shall extend to all public service companies, as hereinafter defined, engaged in or operating a utility business in this State, and to certain additional motor carriers, as hereinafter provided, to the full extent permitted by the Constitution and laws of the United States. The powers of the Commission shall be liberally construed; and the Commission shall have the powers specifically conferred by this article and by any other law, and also all implied and incidental powers necessary and proper to carry out effectually the provisions of this article."

Blackshere could not be abrogated and that because the agreement was "between individuals, and related to a private rather than a public service," it was outside of the Commission's jurisdiction. We held that Suburban's sale of water to these houses was a public service subject to the Commission's regulation. We said that it was immaterial whether the water supply was being furnished by Griffin or by one of the corporations named since, under The Public Service Commission Law, each would be a water company subject to the Commission's regulation if it were engaged "in a public as distinguished from a private service." It was conceded that the water plant was constructed for the purpose of supplying water to about 100 dwellings. As to this, we said, at 517:

> "If this is to be regarded as constituting a private service, how many are necessary to transform it into a public service? Griffin was not limited in his agreement with Blackshere to supply only a definite, limited number, nor was the undertaking one to supply only some of the occupants of the houses to be erected, but all; this was therefore distinctly a public service . . . ."

Thus, we found that the water company engaged in a public service not merely because it supplied water, but rather because its sales were made to the general public.

*Yeatman* is in harmony with the long-standing administrative construction of The Public Service Commission Law. The 1913 opinion of the Commission's General Counsel in the *Matter of Charles B. Clark v. Marlborough Apartment House Company, supra,* concluded that the Commission had no jurisdiction over a company which sold electricity to its apartment tenants at a profit. He stated:

> "In my opinion the apartment house cannot be said to own, operate, manage or control any plant or property even for selling or distributing electricity for light within the meaning of these provisions. As I understand it, it furnishes electric

current solely to tenants of its own rooms, and this current it obtains from the plant of the Consolidated Gas Electric Light and Power Company just as every other customer does. It is not holding itself out as prepared to sell and distribute current to the general public and it is supplying current to the occupants of its apartment house merely as an incident of its business as the manager of an apartment house. If the profit that it is making from the electric current supplied by it to a tenant is felt by the tenant to be unduly onerous, he can escape the burden by giving up his apartment or apartments and going elsewhere."

The Commission's General Counsel thus recognized that the Commission's jurisdiction extended only to sales of electricity made to the "general public," and not to sales made by a landlord to a limited group — his tenants — as an incident to their relation as landlord and tenant. The Commission argues that the opinion should not be considered persuasive today because when rendered in 1913 the term "electrical corporation" was defined in the statute to include a company owning a plant for generating or distributing electricity "for light, heat, or power or for the transmission of electric current for such purposes, *or for any public use whatever.*" [3] (Emphasis added). We note that the italicized portion of this definition was not part of the definition of a "water company" considered by us in construing the law in *Yeatman.* More persuasive, however, is the fact that § 3.1 of the tariff, which allows a landlord to provide electricity to its tenants and to charge them for that service, either as a part of the rent or by a separate charge,

---

**3.** The definition of the term "electrical corporation" included the reference "or for any public use whatsoever" until The Public Service Commission Law was repealed and completely revised by the enactment of Chapter 441, Acts of 1955. Nothing in that Act indicates an intent on the part of the legislature to eliminate the distinction between public and private sales of electricity or to withdraw its recognition, evidenced by a long-continued acquiescence in the Commission's construction and enforcement of The Public Service Commission Law, of the fact that such sales made by a landlord to its tenants are not subject to regulation.

has been on file with the Commission since 1929.[4] The Commission concedes that although it has always had the power to change or suspend the operation of any tariff filed with it, § 3.1 of BG&E's tariff, and particularly § 3.1 (b), has been in existence for over forty years without substantial change by the Commission. It is well settled that the construction of a law by the agency charged with its enforcement, acquiesced in by the legislature, is entitled to great weight and should not be disregarded except for the strongest and most urgent reasons. See *Palm Oil Recovery v. Comptroller*, 266 Md. 148, 291 A. 2d 681 (1972); *Frank J. Klein & Sons, Inc. v. Comptroller*, 233 Md. 490, 197 A. 2d 243 (1964); *Comptroller v. M. E. Rockhill, Inc.*, 205 Md. 226, 107 A. 2d 93 (1954); *Dept. of Tide. Fisheries v. Sollers*, 201 Md. 603, 95 A. 2d 306 (1953). Accordingly, we find no merit in the Commission's argument that we must construe The Public Service Commission Law without regard to whether HRD's sales were made to the public.

The Commission admits that it treats a landlord's act of furnishing electricity to its tenants and charging them for that service as a part of the rent, as a lawful practice, not subject to regulation. Although it admits § 3.1 is valid insofar as it permits such an arrangement, it contends that it is invalid to the extent that it allows a landlord to make a separate charge for electricity. This conclusion cannot be justified under the Commission's own argument that a literal construction of The Public Service Commission Law must be made to determine its applicability, as both transactions fall under the definition of "electrical company" in Article 78, § 2 f. The hearing examiner concluded that electricity furnished and charged for as a part of the rent was not a sale within the definition of "electrical company" and the Commission now maintains that the landlord in

---

4. Section 3.1 of the tariff, in its original form, allowed a landlord renting space for domestic use to furnish electricity to its tenants and charge them either as a part of the rent or by a separate charge. Landlords renting "commercial space" could use the tariff ". . . only where it is impracticable for the Company, in accordance with its standard practices, to supply the service direct to the user, . . . ." In 1969 the tariff was amended to its present form to remove this impediment to its use by landlords of commercial space.

such a transaction is gambling on the fact that the price of electricity will not be increased, and, therefore, is not selling electricity in the same manner as BG&E. We note that the sale of electricity by a company is not a prerequisite to its being deemed an "electrical company" within § 2 f, as any company that owns a plant and transmits electricity is within the literal definition of that sub-section. The distinction offered by the Commission provides no basis for differentiating between separate charges and those included in the rent. The "gamble" taken by a landlord is irrelevant to the question of whether his activities are subject to regulation — a charge for electricity included in the rent is no less a sale than a charge made separate therefrom.

We hold that The Public Service Commission Law does not extend to sales of electricity made by a landlord to its tenants as an incident to that relation. Our decision is, we think, wholly consonant with both the limits placed upon the Commission's jurisdiction in § 1 of Article 78,[5] and the considerable weight of authority from other jurisdictions.[6]

We conclude, therefore, that HRD is not providing a public service subject to regulation under The Public Service Commission Law. The Commission notes that like the service provided in *Yeatman*, HRD services "over one hundred customers" and argues, therefore, that it performs a public service and makes public sales. In *Yeatman*, there was no landlord-tenant relation. Griffin conveyed the tract to Blackshere and retained no control over it. He was not "limited in his agreement to supply only a definite limited

---

5. The Commission's jurisdiction is limited to the regulation of public service companies ". . . engaged in or operating a utility business in this State . . . ." Art. 78, § 1, *See* n. 2, *supra.* Sales of electricity made by a landlord to its tenants, in the circumstances of this case, are plainly incidental to the dominant relationship of landlord and tenant and cannot be said to engage the landlord in a "utility business."

6. Other jurisdictions recognize the distinction between public and private sales, and that sales of electricity made by a landlord to its tenant are private sales, not subject to regulation. *See* Story v. Richardson, 186 Cal. 162, 198 P. 1057 (1921); State v. Public Service Commission of Missouri, 178 S.W.2d 788 (1944); Drexelbrook Assoc. v. Pennsylvania Pub. Util. Com'n, 418 Pa. 430, 212 A. 2d 237 (1965); City of Sun Prairie v. Public Service Commission, 37 Wis.2d 96, 154 N.W.2d 360 (1967). *But see* Cottonwood Mall Shop. Ctr. v. Utah Power & Light Co., 440 F. 2d 36 (10th Cir., 1971).

number" of houses on the tract, nor was he prohibited by that agreement from supplying other homes. He agreed to supply water to all the houses to be built on the tract, and his sales were made to the general public. HRD, however, is making a private sale, limited to its tenants, and made as an incideni to the business of renting commercial space. The fact that HRD is making a profit on the transaction does not change the "incidental" nature of the sale. The Commission argues that the legislative intent behind The Public Service Commission Law, to regulate the monopoly of sales and services of public utilities, merits the regulation of HRD. However, the price and quality of the service furnished by HRD in providing its tenants with electricity is not separable from its business of renting commercial space; it is but a part of the overall cost of occupancy. Both the price of the electricity supplied, and the quality of service incidental thereto, must of necessity be competitive with that of other landlords. As noted in the 1913 opinion of the Commission's General Counsel, the tenant can "escape the burden" of an unduly onerous charge by going elsewhere.

*Judgment affirmed; costs to be paid by the appellant.*