215 Md. 125 (1957)
137 A.2d 187
BALTIMORE TANK LINES ET AL.
v.
PUBLIC SERVICE COMMISSION OF MARYLAND ET AL. (Two Appeals In One Record)
[No. 74, September Term, 1957.]
Court of Appeals of Maryland.
Decided December 18, 1957.
The cause was argued before BRUNE, C.J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.
John R. Norris, with whom were William B. Dulany and Baldwin, Jarman & Norris on the brief, for appellant, Hahn Transportation Company.
Paul R. Kach for appellant, Baltimore Tank Lines.
Charles D. Harris for Public Service Commission of Maryland.
James J. Doherty, with whom was Edwin A. Gehring on the brief, for intervenors, Rufus E. Brandenburg, et al.
HAMMOND, J., delivered the opinion of the Court.
Motor carriers of flammables operating intrastate over Maryland roads became subject to regulation by the Public Service Commission for the first time in 1954. In all there are some twenty such carriers. Two, the appellants Baltimore Tank Lines and Hahn Transportation Company, have for years operated in part as common carriers and in part as *127 contract carriers. All of the others have operated as common carriers only. In the order here appealed from, the Commission said that appellants could continue their divided operations under the permits issued them and honor their existing annual contracts but that, at their expiration or at the end of a year, whichever came first, the rates under future contracts or renewals must conform to the trucker's current common carrier schedule of rates on file with the Commission.
Baltimore and Hahn appealed to the Circuit Court of Baltimore City, contending that the Commission had no power to regulate their contract rates. Appellees, all members of the same trade association, intervened to urge upon the Court their economic philosophy that to permit the same motor carrier to do both a contract and a common carrier business would, as they said it had, produce "chaos" (by which they seemed to mean a distressing competition) and that the Commission was right in its conclusion that its ruling would result in "* * * eventual uniformity of rates and services which should benefit the public welfare and convenience." Judge Harlan held that under Chap. 441 of the Laws of 1955, which re-enacted and completely revised the Public Service Commission Article of the Code and was in effect when the permits were issued, the Commission has full jurisdiction of appellants as "carriers of flammables" and could forbid them to discriminate as to rates and service, and could regulate their contract rates.
If the 1955 revision of the Public Service Commission law is to be read with perceptive accuracy, the statutes that it replaced must be taken into account. Pursuant to a resolution of the House of Delegates of the 1951 Legislature that a committee should revise and recodify but not change the substance of the law, the Governor appointed a committee of lawyers experienced in that field of law to carry out the legislative mandate. Its report of February 28, 1955, explained that it had carried out the recommendation of the House of Delegates. Its introduction to the proposed draft said: "The emphasis in the proposed draft has been on the aim stated in the resolution creating this Commission, namely, to `revise and recodify the laws concerning the Public Service Commission *128 in order that such laws may be enacted in more orderly and comprehensible fashion'. There has, accordingly been no desire to introduce any substantial changes in the pattern of public utilities regulation, except in a very few instances, each of which is considered at length in the reporter's explanatory notes accompanying each section of the draft. * * *. In general, changes in phraseology of the present law are not intended to effect any change in meaning unless such intention is specifically stated in the explanatory notes, or the clear language of the draft leads inescapably to the conclusion that some change in meaning must have been intended." In Public Service Commission v. Baltimore Transit Company, 207 Md. 524, 536, the Court construed the prior law in a certain fashion in part because that construction conformed to the meaning of the revised law and the Committee had said no change of substance was intended.
Chapter 58 of the Laws of 1954 added a new section to Art. 78 of the Code of 1951, Sec. 19A: (a) to provide that motor carriers of flammables in bulk using the public roads of Maryland were made subject to the jurisdiction and authority of the Commission; (b) to forbid operation without a permit that was to be granted only after the Commission was satisfied that it was expedient and that the applicant had met all safety requirements prescribed and had taken out either a satisfactory liability policy or a surety bond to protect the public from the negligence of the carrier; (c) to require the filing of schedules of rates and to make carriers subject to the provisions of Secs. 29, 30 and 31 of Art. 78: (the sections subjecting common carriers and public service companies to rate regulation) "provided, however, that any carrier of inflammable or combustible liquids, in bulk, in tank vehicles, and for compensation as defined herein, who or which does not desire to operate as a common carrier serving the general public, shall list in addition in its schedule or schedules the shippers to be served"; and (d) to direct the Commission if it deems it best for the public welfare and convenience to grant a permit; "provided, however, that the Commission shall issue a permit to any such carrier in operation as a carrier of inflammable or combustible liquids, in *129 bulk, in tank vehicles, using the public streets and highways within the State of Maryland on June 1, 1954, if such carrier files an application, as provided herein, within ninety days of the effective date of this section, and furnishes proof of compliance with the insurance or bond, as well as the safety requirements established by the Commission."
Baltimore and Hahn duly applied for permits to continue their same operations, as did the appellees. After a hearing at which the testimony was limited almost to the formal reports of its investigators as to the character and extent of the business of the applicants as of June 1, 1954, the Commission, on December 8, 1954, ruled that one a common carrier on June 1st could not become a contract carrier under the grandfather clause but only upon a showing that the "public welfare and convenience" would be served but that Baltimore and Hahn could continue to do both common and contract business. Upon appeal to the Circuit Court of Baltimore City, Judge Nice noted that the protestants before him, the appellees here, contended that the law permitted operations only as a common carrier and complained that the Commission had arbitrarily denied them the right to offer evidence in support of their contention. Judge Nice held that the 1954 statute covered both common and contract carriers and that Hahn specifically (and Baltimore by necessary implication) was entitled, as the Commission had found, to one permit entitling him to operate both as a common and contract carrier. The court's decree of November 14, 1955, remanded the case to the Commission to permit the introduction by the original applicants "of any relevant evidence pertaining to all the issues of this case", including the granting of the permits to those carriers named in the Commission's order of December 8, 1954. The order of the Commission setting the case for rehearing gave no notice that rates were to be dealt with. It said only that the applicants could offer additional testimony, and that unless cause to the contrary were shown, permits would be issued in conformity with its order of December 8, 1954.
At hearings which began on December 15, 1955, and ended on April 11, 1956, Hahn showed that three-fifths of its revenues *130 came from common carrier business and two-fifths from contract business. He had contracts with some twelve or fifteen shippers. Baltimore derived about half its revenue from contract carriage although it had but one contract customer. Both of them defended the economic desirability and business need for contract service and offered evidence of the difference between it and common carrier service. A common carrier must serve all of the general public who seek its service on an equal basis. It may not set aside part of its equipment for certain customers to the exclusion of others. Its liability as to the freight it transports is that of an insurer. Its contracts usually consist of the terms and conditions in the uniform bill of lading plus the provisions of its published tariffs. A contract carrier on the other hand can devote equipment to the exclusive needs of one shipper. His liability is that of a bailee unless modified by special contract. He can guarantee a rate for a fixed period and so enable the shipper to bid on contracts to furnish the commodity to be hauled on the basis of a known freight charge over the period of the contract. He can offer special service, such as that at unusual hours or that of insuring complete performance of the shipper's contract by personal attention to recurring need for shipments. He can become, to some extent, an integral part of the shipper's organization.
The effort of the appellees was to show that they, as common carriers, do exactly the same things and supply the same services for their customers that appellants do for their contract shippers. They urged that in the nature of the business no real distinction between common and contract service can exist and that appellants' claims as to the business needs and usefulness were but shams to justify the charging of rates lower than those of the common carriers. If the law gives the Commission the power to decide the answer to the respective contentions, the courts, including this Court, can decide only whether there was evidence to support whatever conclusion the Commission reached, and judicial opinion as to the validity or soundness of that conclusion would be entirely immaterial. We pause in the consideration of the legal power of the Commission long enough to note that the *131 position and claims of appellants are not far fetched or novel. Found convincing by the Commission were similar claims by City Express, Inc., as to the need for contract carriage in the face of identical charges by competitors of sham and ruinous competition, and its decision was affirmed in Tidewater Lines v. Pub. Serv. Comm., 199 Md. 533. Whether a carrier is, or should be held to be, a common or a contract carrier often is a close question. See a discussion of the differences in Public Utilities Commission v. Utterstrom Bros. (Me.), 8 A.2d 207, where a contract carrier for the A. & P. stores was held not to be competitive with common carriers because of specialized services. On the other hand, in Alton Railroad Company v. United States, 315 U.S. 15, 86 L.Ed. 586, one a contract carrier under Oregon law was held properly granted an Interstate Commerce Commission certificate as a common carrier under a grandfather clause that required "bona fide" operation in a state in the status granted. In United States v. Contract Steel Carriers, 350 U.S. 409, 100 L.Ed. 482, the Supreme Court affirmed a reversal by a three-judge District Court of an order of the Interstate Commerce Commission which had changed the status of a carrier of certain steel items from contract to common, although the carrier served sixty-nine shippers under contract and actively solicited more business.
The Commission in the case before us recognized the right of appellants to do contract as well as common carrier hauling both in its first and second orders. There was precedent for the result of the interpretation the Commission gave the 1954 Act and the 1955 Act in this respect. It has been established that a hauler may be a common carrier as to one part of its business and a contract carrier as to another part. Terminal Taxicab Co. v. Dist. of Col., 241 U.S. 252, 60 L.Ed. 984; Rugg v. Davis (Mass.), 69 N.E.2d 579; Mt. Tom Motor Lines v. McKesson & Robbins (Mass.), 89 N.E.2d 3; Northern Fur Co. v. Minneapolis, St. Paul & S.S.M. Ry. Co. (7th Cir.1955), 224 F.2d 181.
Recognition of the dual status of appellants had been formally announced by the Commission in its order of December 8, 1954. The Committee's report and proposed draft of the *132 revised law was issued on February 28, 1955, and soon after adopted by the Legislature. Both the Committee in proposing and the Legislature in passing what is now Article 78 of the Code, 1957 Supp., presumably acted with knowledge of the Commission's decision. Chapter 441 of the Laws of 1955 in Sec. 2 (b) adopts the definition of carrier of flammables that was in the 1954 Act. The definition in Sec. 2 (d) of a common carrier does not include a contract carrier, and the definition in Sec. 2 (o) of a public service company includes common carriers but not contract carriers. Section 31 requires all carriers of flammables over Maryland roads to obtain a permit, and Sec. 32 restates the safety and insurance provisions of the 1954 Act and sets up the standards that are to guide the Commission in issuing permits, one of which is the rates to be charged.[1] This, however, would not apply to the appellants since the 1954 Act gave them a permit under the grandfather clause if they met safety and insurance requirements and their grandfather rights were protected in the 1955 law, which, in Sec. 99, provided: "* * * and nothing in this article shall be construed as invalidating any action lawfully taken or rights lawfully acquired by any person prior to the effective date of this act." Chapter 441 of the Laws of 1955 repeated in revised form, without change of substance, the broad powers of the Commission over common carriers and public service companies in the prevention of discrimination and the regulation of their rates, in Sections 25, 26, 27, 30, 61, 62, 63 and 64. The only specific reference to rates of contract carriers of flammables is in Sec. 30 (d), wherein it is provided that "Private carriers of flammables, as well as common carriers, shall file tariff schedules in accordance with this section, and shall also list therein the shippers to be served."
*133 Baltimore and Hahn are not in full agreement as to the contentions made. Baltimore says that no grandfather motor carrier of flammables is subject to regulation of rates, that in particular its contract rights with its one such shipper were preserved to it indefinitely by the grandfather clause, and that the 1955 law, construed as the Commission construed it, raises doubts as to its constitutionality, particularly as to the title. Hahn argues that the 1955 law gave the Commission jurisdiction as to rates only over common carrier operations and not over contract carrier business, that to read the statute otherwise would make the law unconstitutional as requiring it, against its will, to devote its contract equipment to common carrier use. Both argue that the second hearing was arbitrary and illegal  that there was a lack of procedural due process  because no notice was given that rates were to be regulated and no proper testimony as to rates heard.
We need not pass on the adequacy of the hearing or on the constitutional questions, and we do not, because the case turns, as we see it, on the meaning of the 1954 and 1955 statutes.
The 1954 Act was primarily a safety measure. By reference it gave the Commission power to regulate the rates of common carriers. The 1954 Act fell short of clearly indicating an intent to give power to regulate contract rates. The 1955 Act supports the inference that no such power was intended by the 1954 law. The 1955 Act, as had the prior act, clearly subjected contract carriers of flammables to permit, safety and insurance requirements. The grandfather clause made the requirement of initial approval of rates inapplicable to the appellants. The 1955 law, without doubt, continued the power of the Commission to regulate the rates of common carriers of flammables. We do not find any express power, or any power by reasonably clear implication, to regulate rates of contract carriers of flammables. The fact that there are to be permits and supervision of safety and insurance, does not of itself import a right to regulate rates. See Tidewater Lines v. Pub. Serv. Comm., 199 Md. 533, 536, supra. If appellants are entitled to divide their business between common and contract carriage, as the Commission *134 found  we think properly  the contract business, under the 1955 statute, would seem to have to be treated as if it were a separate entity.
In reading the present statutes as not giving a right to regulate the rates of contract carriers we do not intimate that the Legislature could not give such a right. This Court has decided that a provision similar to the permit requirements for contract carriers is constitutional and does not necessarily convert the contract carrier into a common carrier against its will and so infringe a constitutional right. Rutledge Assn. v. Baughman, 153 Md. 297. Judge Offutt distinguished the cases relied on by Hahn  viz., Michigan Commission v. Duke, 266 U.S. 570, 69 L.Ed. 445; Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 70 L.Ed. 1101; on the ground that the statute did not require a contract carrier to become a common carrier but only to take out a permit. Sec. 31 (a) of Art. 78 of the Code (1957 Supp.) now requires a permit of a contract carrier but Sec. 31 (c) provides: "The public duties of a common carrier shall not be imposed on any person with respect to any vehicle for which a permit is required under this section, if the vehicle is not actually engaged in public transportation." In Smith v. Cahoon, 283 U.S. 553, 75 L.Ed. 1264, the Supreme Court refused to uphold a criminal conviction under a Florida statute which did not in terms require a contract carrier to become a common carrier, but made elaborate provisions as to both without providing standards that would enable the ordinary man to tell which applied to private carriers as well as to common carriers. On the other hand, in Stephenson v. Binford, 287 U.S. 251, 77 L.Ed. 288, the Supreme Court upheld a Texas statute which subjected contract carriers to the jurisdiction of the state regulatory body, required a permit and the obtention of insurance and also provided that the rates of contract carriers should not be more than those of common carriers for similar services. Provisions similar to those in the Stephenson case have been upheld in a number of State courts. See Mt. Tom Motor Lines v. McKesson & Robbins (Mass.), 89 N.E.2d 3, supra; Morel v. Railroad Comm. (Cal.), 81 P.2d 144; Rugg v. Davis (Mass.), 69 N.E.2d *135 579, supra. In the latter case, the law was said to be, on the strength of some twenty cited cases, that a State may increase or diminish the rate of compensation of a common or of a contract carrier against the wills both of the carrier and the person who is obligated to pay him, regardless of pre-existing contracts between them. We do not decide that the Legislature could not constitutionally provide for regulation of the rates of contract carriers of flammables if, in its judgment, this was an appropriate means of controlling the use of the roads and of regulating competition affecting common carriers. We decide only that the Legislature has not yet granted the Commission that power. The conclusions we have reached make it unnecessary that we pass on any of the other contentions of the parties.
Decree reversed and case remanded for further proceedings not inconsistent with this opinion, appellees to pay the costs.
NOTES
[1] Sections 31 and 32 apply generally to "Motor Carrier Companies". The notes of the reporter to the revisory committee point out at page 33 of their report that a single comprehensive provision has been substituted for the repetitious provisions relating to the transportation of passengers and freight, respectively, by Code, 1951, Art. 56, Secs. 169, 171, 187 and 188 (which were repealed by Ch. 442 Laws of 1955) and Code, 1954 Supp., Art. 78, Sec. 19A as added by Ch. 58 of the Laws of 1954.