693 P.2d 928

**AMERICAN CABLE TELEVISION, INC.,** an Arizona corporation; Cablecom-General, Inc., an Oklahoma corporation; and Arizona Cable Television Association, an Arizona non-profit corporation, Plaintiffs-Appellees,

v.

**ARIZONA PUBLIC SERVICE COMPANY, Defendant-Appellant.**

**AMERICAN CABLE TELEVISION, INC.,** an Arizona corporation; Cablecom-General, Inc., an Oklahoma corporation; and Arizona Cable Television Association, an Arizona non-profit corporation, Plaintiffs-Appellees,

v.

**ARIZONA CORPORATION COMMISSION, B.L. "Bud" Tims, James Weeks, and Diane B. McCarthy,** as Commissioners of and constituting the Arizona Corporation Commission, Defendants-Appellants.

Nos. 1 CA–CIV 6567, 1 CA–CIV 6568.

Court of Appeals of Arizona, Division 1, Department A.

Dec. 1, 1983.

Review Denied Feb. 2, 1984.

Martori, Meyer, Hendricks & Victor, P.A. by Randall C. Nelson, Ron Kilgard, Phoenix, Hogan & Hartson by Gary L. Christensen, Paul Glist, Washington, D.C., for plaintiff-appellee American Cable Television, Inc.

Brown & Bain, P.A. by Alan H. Blankenheimer, Casceil C. Medlin, Phoenix, for plaintiff-appellee Cablecom-General, Inc.

Ryley, Carlock & Ralston, P.A. by N. Warner Lee, Abigail Carson Berger, Phoenix, for plaintiff-appellee Arizona Cable Television Ass'n.

Wentworth & Lundin by John E. Lundin, Charles W. Herf, Phoenix, for defendant-appellant Arizona Public Service Co.

James M. Flenner, Chief Counsel, Legal Div., Phoenix, for defendant-appellants Arizona Corp. Com'n and members.

## OPINION

CONTRERAS, Judge.

This is a consolidated appeal from the decision of the Superior Court, the Honorable Robert A. Hertzberg, declaring that the Arizona Corporation Commission (Commission) lacks the authority required under federal and state law to displace the jurisdiction of the Federal Communications Commission (FCC) over cable television pole attachment agreements. The dispute arose after plaintiffs-appellees challenged the Commission's action on July 22, 1981, in which it asserted that it would henceforth exercise such jurisdiction. Appellants also appeal from the award of attorneys fees. Pursuant to A.R.S. § 12–2101(A) and A.R.S. § 40–254 we have juris-

diction over this appeal. We affirm the order and judgment.

## I. CABLE TELEVISION AND POLE ATTACHMENT AGREEMENTS.

In order to better understand the question of whether the Commission has jurisdiction over pole attachment agreements, a brief history concerning the development of cable television and the utilization of pole attachment agreements is set forth. Conventional television is broadcast from a transmission tower over the air to receiving antennas. Cable television was originally developed to bring television to areas which, because of their distance from metropolitan centers or isolation due to physical barriers, could not receive conventional television signals. The original cable companies received over-the-air signals from the nearest broadcast market and retransmitted them via coaxial cable to small towns and rural subscribers.

Today, cable television has matured to serve urban and rural subscribers alike with alternatives to ordinary over-the-air television. For example, a cable television subscriber in Phoenix can receive all the programming available over-the-air plus additional programming provided by the cable operator. A subscriber can receive programs from other cities such as New York, Chicago and Atlanta. In addition, a television subscriber can receive satellite services such as ESPN (Sports), CNN (24 hour news) and USA Cable Network which are considered to be basic cable services. For additional charges the subscriber may also receive services such as HBO and Showtime (movies and other forms of entertainment).

In order to provide this programming, cable companies physically connect coaxial cable from their reception and transmission equipment to the television sets of subscribers. Cable operators must therefore either (1) attach their cable to existing networks of utility poles, (2) lay their cable underground, or (3) build their own system of poles. For economic and aesthetic reasons, a very substantial amount of cable

attachment has been accomplished by attaching cables to pre-existing utility poles. The cable company attaches its cable to the utility's pole pursuant to a private pole attachment agreement. Under the agreement, the utility whose poles are being utilized, issues a series of licenses for the use of poles as requested by the cable operator. The licenses are non-exclusive and revocable. The cable company receives the right to attach its cables and related equipment to the unoccupied space on the licensed pole but it acquires no property interest in the pole itself. The utility is free to demand the removal of the cable whenever it needs the space.

The agreement requires the cable company to pay the full costs of attaching the cable, satisfy all applicable safety requirements, and perform all of the tasks involved in making the pole ready for the cable to be attached. The agreement also requires the cable operator to pay an "annual attachment fee" for the use of surplus pole space. From the record, it appears that there has been a substantial increase in these fees. A few years ago, the fees in Arizona were approximately $2.00–$3.00 per pole per year but more recently the fees have ranged from $8.00–$13.00 per pole per year.

## II. JURISDICTION: FCC AND STATES.

In 1978, Congress added Section 224 to the Communications Act of 1934, 47 U.S.C. § 224, referred to as the Federal Pole Attachment Act. The Act requires the FCC to regulate the rates, terms, and conditions of pole attachments, and sets forth the basic guidelines the FCC is to use in setting rates. Pursuant to statutory guidelines, the FCC has developed a general formula for calculating pole attachment fees, which was upheld in *Monongahela Power Co. v. FCC*, 655 F.2d 1254 (D.C.Cir. 1981). The FCC's formula is tied to the utility's rate of return and will take local conditions or other circumstances into account when appropriate. *See e.g. Liberty TV Cable, Inc. v. Gulf States Util. Co.,*

PA–80–0011, 49 Rad.Reg.2d (P & F) 843, Mimeo 000765 (May 8, 1981). In August 1982, Congress amended the Federal Pole Attachment Act to make the formula a permanent feature of the Act. *See*, Communications Act Amendments of 1982, Pub.L. No. 97–259, § 106 (1982).

The FCC's jurisdiction over pole attachments is subject to reverse "preemption" by the State. It is the Commission's attempt at preemption which is at issue in this appeal. Section (c) of the Act permits displacement of FCC authority "with respect to rates, terms, and conditions for pole attachments in any case where such matters are regulated by a State," if state regulation meets specific federal prerequisites. In order to supplant FCC regulation, a state must certify to the FCC that it has the authority to regulate the "rates, terms and conditions" of pole attachments and "the authority to consider ... the interests of the subscribers of cable television services, as well as the interests of the consumers of the utility services."

In July 1981, the FCC was considering a number of complaints brought by cable operators against the pole attachment practices in Arizona of Arizona Public Service Company (APS) and Mountain Bell Telephone Company (Mountain Bell). In an opinion released on July 9, 1981, the FCC ruled (in PA–79–0031, Mimeo 001869) that the rates charged by APS and Mountain Bell were unreasonable and illegal and ordered an immediate rate reduction and refund of overcharges to the cable operators. Six days later, the Arizona Corporation Commission published an agenda for its next regular open meeting giving notice that it would consider "[p]ossible declaration to FCC concerning pole attachment regulation."

On July 22, 1981, the Commission declared that it would assume jurisdiction under existing state law to regulate the rates, terms and conditions of pole attachment disputes between cable television and public service corporations. The Commission did not proceed by formal notice-and-comment rule-making. It did not conduct a hearing nor make any findings. On July 23, 1981, the Commission sent a letter to the FCC purporting to certify that it regulated pole attachments pursuant to Section (c) of the Pole Attachment Act. The FCC rejected the certification for failure to cite any relevant authority. On August 12, 1981, the Commission filed a new certification relying on state statutes, especially A.R.S. §§ 40–285 and 40–361. Since the Pole Attachment Act does not permit the FCC to question the validity of the state agency's assertion of authority, the FCC thereupon ceased regulation of Arizona pole attachment disputes.

This suit was filed as a Special Action in superior court against the Commission and APS, one of the major owners of utility poles in Arizona, to nullify the Commission's assertion of jurisdiction. The superior court in its order and judgment held that the Commission lacked authority under state law to regulate pole attachments and to displace FCC regulation. The court declared that the purported letters of certification were null and void and directed that the FCC be so informed. The court also awarded plaintiffs-appellees a portion of their reasonable attorney's fees pursuant to A.R.S. § 12–348.

### III. ISSUES PRESENTED FOR REVIEW.

1. The first question presented for review is whether the Commission has jurisdiction over cable television pole attachment agreements.

2. The second question is whether the award of attorney's fees was reasonable.

### IV. DISCUSSION.

A. THE CORPORATION COMMISSION DOES NOT HAVE JURISDICTION TO REGULATE POLE ATTACHMENT AGREEMENTS.

1. *The Commission May Not Regulate Cable Television Pole Attachment Agreements Under Its Authority To Regulate The Electric And Telephone Utilities.*

Appellant APS contends that the Commission may regulate cable television pole

attachment agreements incident to its statutory power to regulate utilities that own the poles. A.R.S. § 40–285(A) provides that a utility

> shall not ... lease ... the whole or any part of its ... plant, or system, necessary or useful in the performance of its duties to the public ... without first having secured from the [C]ommission an order authorizing it so to do.

■ APS argues that a utility pole does not have surplus or useless space but that all parts of a utility pole are "necessary or useful" in the performance of the utilities' duties to the public and that because the rental of "necessary or useful" property must be authorized by the Commission, the Commission therefore has authority to determine the "rates, terms and conditions" of pole attachment agreements. We disagree with both APS's premise that all parts of a utility pole are "necessary or useful" and its conclusion that § 40–285 gives the Commission authority over "rates, terms and conditions."

■ We believe that the legislature intended in § 40–285 to prevent a utility from disposing of resources devoted to providing its utility service, thereby "looting" its facilities and impairing its service to the public. In the present case, a cable can only be attached to a utility pole if there is additional or surplus space and therefore that part of the pole is not currently "necessary or useful" to the utility's service to the public. *See e.g. Teleprompter Corp. v. Hawkins,* 384 So.2d 648 (Fla.1980).

■ However, even if § 40–285 applied to surplus space on a utility pole, it would not apply to a pole attachment agreement. These agreements are licenses and not leases. The agreement utilized is specifically denominated as "License Agreement" and a reading of the agreement impels the conclusion that APS is issuing a license authorizing the attachment of communications facilities to APS utility poles for the distribution of the licensee's communications service to the licensee's subscribers. "A license is merely a permit or privilege to do what otherwise would be unlawful." *Ulan v. Vend-A-Coin, Inc.,* 27 Ariz.App. 713, 715, 558 P.2d 741, 743 (1976). As such, it does not transfer, mortgage or encumber any property. Here, the license permits cable operators to attach their cables to utility poles without being liable as trespassers.

Moreover, even assuming arguendo that § 40–285 were applicable to utility pole licenses, the Commission would still not have the authority to regulate the "rates, terms and conditions" of pole attachment agreements. This section only provides that before encumbering or disposing of any part of a "necessary or useful" plant, the utility must first obtain a Commission order authorizing such encumbrance or disposition, but the section has no provision for review of the "rates, terms and conditions".[1] The Arizona Attorney General has stated that § 40–285:

> is a permissive statute passed for the protection of the public interest. The Corporation Commission may only concern itself with questions relating to whether or not the proposed transfer will be injurious to the rights of the public.

---

1. A.R.S. § 40–285 provides in pertinent part:
    A. A railroad, street railroad, pipe line, gas, electrical, telephone, telegraph, or water corporation shall not sell, lease, assign, mortgage or otherwise dispose of or encumber the whole or any part of its railroad, line, plant, or system, necessary or useful in the performance of its duties to the public, or any franchise or permit or any right thereunder, nor shall such corporation merge such system or any part thereof, with any other public service corporation without first having secured from the [C]ommission an order authorizing it so to do. Every such disposition, encumbrance or merger made other

than in accordance with the order of the [C]ommission authorizing it is void.

.   .   .   .   .

    C. Nothing in this section shall prevent the sale, lease or other disposition by any such corporation of property which is not necessary or useful in the performance of its duties to the public, and any sale of its property by such corporation shall be conclusively presumed to have been of property which is not useful or necessary in the performance of its duties to the public as to any purchaser of the property in good faith for value.

The Commission has nothing to do with the rights of the intended purchaser and has no power to determine the ... fairness of the purchase price....

Opinion of the Attorney General of Arizona, Opinion No. 62–7, at 13 (1962). *See also, Trico Elec. Coop. v. Ralston*, 67 Ariz. 358, 196 P.2d 470 (1948) (holding that the Commission lacked authority to consider the construction or validity of a utility's sale of electrical and water distribution lines under an option agreement); *General Cable Corp. v. Citizens Util. Co.*, 27 Ariz. App. 381, 555 P.2d 350 (1976) (holding that the Commission was precluded from reviewing the reasonableness of price terms in a sale of electrical power).

In addition, this interpretation of A.R.S. § 40–285 is consistent with California's interpretation of § 851 of its Utility Code. A.R.S. § 40–285 was modeled after California's statute (Cal.Pub.Util.Code § 851). In *California Community Television Ass'n v. General Tel. Co.*, 73 Cal.P.U.C. 507, 511 (1972), the California Commission agreed that the claim that it had jurisdiction over pole attachments because they were somehow akin to the "sale or other disposition of utility property" simply "misconceived the purport of Section 851." *Id.*

■ APS also asserts that A.R.S. § 40–361 is another source for the Commission's authority to regulate pole attachment agreements. We disagree.

A.R.S. § 40–361 provides, in pertinent part:

Charges demanded or received by a public service corporation for any commodity or service shall be just and reasonable.

We believe that the clear purpose of this section is to enable the Commission to review for fairness the rates a public utility charges its customers for public utility services. The context of Title 40, which deals exclusively with public utility services provided by public service corporations, makes this evident. *See City of Phoenix v. Kasun*, 54 Ariz. 470, 97 P.2d 210 (1939) (discussion of policy). However, we do not find that pole attachment licenses granted by APS are public utility services. *See*

*City of Jackson v. Michigan Bell Tel. Co.*, 63 P.U.R.3d 384 (Mich.Pub.Serv.Comm'n 1966); *In re Application for Declaratory Ruling*, Docket 6705, order No. 4642 (Mont.Pub.Serv.Comm'n May 6, 1980) (*appeal dismissed*) (declining pole attachment jurisdiction: cable television attachments are not public utility services even if poles are dedicated to public use, because there is no duty to permit such attachments).

2. *The Commission May Not Regulate Cable Operators Directly Because Cable Television Systems Are Not Public Service Corporations.*

The Commission asserts that it can regulate not only pole attachment agreements, but cable television generally, because cable television operators are "engaged in ... transmitting messages" within the meaning of Article 15, §§ 2 and 10 of the Arizona Constitution and are therefore "public service corporations." We disagree with this characterization of cable companies as public service corporations.

■ Article 15, Sections 2 and 10 provide respectively, in pertinent part,

All corporations other than municipal engaged ... in transmitting messages or furnishing public telegraph or telephone service and all corporations other than municipal, operating as common carriers, shall be deemed public service corporations.

.    .    .    .    .

[A]ll ... transmission ... corporations, for the transportation ... of electricity, messages, ... or other property for profit, are declared to be common carriers....

We believe that for a message-transmitting corporation to be a public service corporation under the Arizona Constitution, it must be a common carrier. However, in our opinion cable companies are not common carriers.

The FCC's decision that cable operators are not common carriers has twice been approved by the United States Supreme Court. *FCC v. Midwest Video Corp.*, 440

U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *National Ass'n of Reg. Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C.Cir.1976); *Frontier Broadcasting Co. v. Collier*, 24 F.C.C. 251 (1958). The Arizona cases also support a conclusion that cable operators are not contract or common carriers. *General Alarm, Inc. v. Underdown*, 76 Ariz. 235, 262 P.2d 671 (1953) is particularly instructive as it deals with the carriage of messages and interpreted the Arizona Constitution. General Alarm installed burglar, fire and emergency alarms on its customers' homes or businesses. When the alarm was activated, it transmitted an electric signal to General Alarm's control office, from which it was relayed to the appropriate fire, police or other governmental agency. The court, in rejecting the contention that General Alarm was a common carrier of messages stated:

Our view is that [General Alarm] cannot qualify as a public service corporation. The constitution says it must be engaged in sending messages. Necessarily, this means it must be in the *business of sending messages for the public*. [General Alarm's] business cannot within reason be said to be that of sending messages for the public generally or any substantial segment thereof. Its business is essentially that of property protection.

*Id.* at 239, 262 P.2d at 673 (emphasis added).

■ The analysis is analogous to the instant case. Cable television operators are not "in the business of sending messages for the public." Cable subscribers pay to receive entertainment and information provided by the cable operator just as they subscribe to a newspaper or magazine. *See also Arizona Corp. Comm'n v. Continental Security Guards*, 103 Ariz. 410, 443 P.2d 406 (1968) (general nature of business is security not carriage); *Quick Aviation Co. v. Kleinman*, 60 Ariz. 430, 138 P.2d 897 (1943) (crop dusting not carriage of pesticides); *Television Transmission, Inc. v. PUC*, 47 Cal.2d 82, 301 P.2d 862

(1956). Plainly, the general nature of the business of Arizona cable operators is providing entertainment and programming to their subscribers. This simply is not common carriage.

3. *The Legislature Has Delegated The Authority To Regulate Cable Companies To The Municipalities.*

■ The legislature has granted the authority to regulate cable companies to municipalities. A.R.S. § 9–505 through 9–508 provide that the municipalities have the authority to "impose conditions, restrictions and limitations ... upon the construction, operation and maintenance of cable television systems." A.R.S. § 9–506(A). In addition, A.R.S. § 40–354 as amended in 1975 provides that "[n]othing contained in [Article 6.1] shall vest any jurisdiction over public agencies or cable television systems in the Arizona [C]orporation [C]ommission." We believe that the delegation of authority is a valid one and evidences a clear intent that the municipalities, subject to federal preemption, have the authority to act in this area. *See Arizona Pub. Serv. Co. v. Town of Paradise Valley*, 125 Ariz. 447, 610 P.2d 449 (1980).

■ After considering the foregoing arguments advanced by APS and the Commission, we conclude that the Commission lacks the authority required under federal and state law to displace the jurisdiction of the FCC over cable television pole attachment agreements. Suffice it to say that our disposition of the principal arguments eliminates the necessity of discussing additional subsidiary arguments posed by appellants and appellees.

B. THE TRIAL JUDGE ACTED WITHIN HIS DISCRETION IN AWARDING PLAINTIFFS BELOW A PORTION OF THEIR ATTORNEYS FEES PURSUANT TO A.R.S. § 12–348.

■ A.R.S. § 12–348 provides for an award of attorneys fees to a private party that prevails in certain types of litigation

against the state. Subsection A provides, in pertinent part, that:

[A] court shall award fees and other expenses to any party other than this state which prevails by an adjudication on the merits in any of the following:

.    .    .    .    .

3. A court proceeding to review an agency decision, pursuant to title 12, chapter 7, article 6, or any other statute authorizing judicial review of agency decisions.

5. A special action proceeding brought by the party to challenge an action by the state against the party.

The present case involved a special action challenge to the Commission's claim of jurisdiction to regulate pole attachment agreements and hence an award of attorney's fees pursuant to A.R.S. § 12–348(A) was appropriate.

The Commission, however, argues that fees may only be awarded if the conduct of the state agency was "unreasonable." We disagree. The statute contains no restriction on the reasonableness or unreasonableness of the state agency's conduct as a basis for determining the award of attorney's fees. Rather, the legislature specified certain types of proceedings in which fees may be awarded and certain circumstances in which fees may be disallowed. If the litigation falls within one of the categories enumerated in subsection (A) and not excluded by subsection (F), an award of attorneys fees is proper.

The Commission argues that exception 1 of subsection (F) precludes any award of fees in this matter. We disagree. The section provides, in pertinent part, that attorneys' fees shall not

[a]pply to an action arising from a proceeding before this state in which the role of this state was to determine the eligibility or entitlement of an individual to a monetary benefit or its equivalent or to adjudicate a dispute or issue between private parties or to establish or fix a rate.

In the instant case, the Commission was not adjudicating a dispute between private parties nor was it establishing or fixing a rate. The issue in this litigation was whether the *Commission* had *jurisdiction* to regulate pole attachment agreements and appellees directly challenged the Commission's action in asserting jurisdiction. While the jurisdictional question could have resulted in the Commission becoming a forum for future resolution of disputes and rate setting, the immediate litigation did not involve that type of a dispute. As a result, the trial court was not precluded under exception 1 of subsection (F) from making such an award.

We further find that the amount of fees awarded was within the trial court's discretion. Pursuant to subsection (D), the award may not exceed the amount which the prevailing party has paid or has agreed to pay the attorney or a maximum amount of seventy-five dollars per hour, unless a higher fee is justified. Plaintiffs originally requested $121,630.25. The trial court awarded $111,520.45. As a general principle of law, a trial judge's decision on fees can only be set aside if it was an abuse of discretion. *Zeckendorf v. Steinfeld*, 12 Ariz. 245, 100 P. 784 (1909), modified, 225 U.S. 445, 32 S.Ct. 728, 56 L.Ed. 1156 (1912); *Allison v. Cvens*, 4 Ariz.App. 496, 421 P.2d 929 (1966), vacated in part, 102 Ariz. 520, 433 P.2d 968 (1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292 (1968). We do not find an abuse of discretion.

For the reasons previously stated, the order and judgment entered is affirmed in all respects.

KLEINSCHMIDT and CORCORAN, JJ., concur.