530 A.2d 734

The **CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND, et al.**

v.

**MARYLAND/DELAWARE CABLE TELEVISION ASSOCIATION, INC., et al.**

No. 159, Sept. Term, 1986.

Court of Appeals of Maryland.

Sept. 11, 1987.

554

Sandra Hall-Eckroade, Asst. Gen. Counsel, Bryan G. Moorehouse, Gen. Counsel, Baltimore, on brief for appellant The Public Service Com'n.

Leslie A. Vail, Thomas F. McDonough, Baltimore, on brief for appellant Chesapeake & Potomac Telephone Co.

Mary Donn Jordan and John J. Sullivan, Washington, D.C., on brief for appellant Potomac Elec. Power Co.

Barry J. Sheingold, Salisbury, on brief for other appellant Delmarva Power & Light Co.

J. Edward Davis (Monica L. Newman and Davis & Jenkins, on the brief), Towson, for appellee.

Argued before MURPHY, C.J., and COLE, RODOWSKY, COUCH,[*] McAULIFFE and ADKINS,

---

[*] Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

JJ., and ROBERT L. KARWACKI, Associate Judge of the Court of Special Appeals (Specially Assigned).

COLE, Judge.

The question before us in this appeal is whether the Public Service Commission of Maryland (PSC) has jurisdiction to regulate "pole attachment" agreements between utility companies and cable television companies.

We set forth the following facts to place the issue in proper focus. Cable television companies provide programming to their subscribers by running coaxial cables, either underground or above ground on poles, from their transmission centers to the television sets of their customers. Because of practical, economic, and aesthetic reasons, nearly all cable television lines are attached to existing utility poles pursuant to leases negotiated between cable television companies and utility companies. These leases are generally referred to as "pole attachment" agreements.

In 1978, Congress determined that regulation of pole attachment agreements was necessary to ensure that cable television companies would be permitted to attach their lines to utility poles owned (and virtually monopolized) by utility companies. However, Congress observed that only a small number of states were monitoring these agreements. S. Rep. No. 580, 95th Cong., 2d Sess. 13–14, *reprinted in* ments of 1978 (Act), Pub. L. No. 95–234, 92 Stat. 36, (codigress further determined that state and local regulatory bodies, because of their familiarity with local conditions, could regulate pole attachment agreements more effectively than a federal regulatory body. *Id.* at 16–17, *reprinted in* U.S. Code Cong. & Admin. News at 124–25. Therefore, in an effort to assure regulation of all pole attachment agreements, Congress enacted the Communications Act Amendments of 1978 (Act), Pub.L. No. 95–234, 92 Stat. 36, (codified at 47 U.S.C. § 224), which provides for federal regula-

---

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

tion of pole attachment agreements in the absence of state regulation. In other words, the Act vests the Federal Communications Commission (FCC) with plenary power to regulate the "rates, terms, and conditions of pole attachment" agreements. 47 U.S.C. § 224(b). The Act also provides the following mechanism for states to use to exercise jurisdiction over these agreements:

(1) Nothing in this section shall be construed to apply to, or to give the [FCC] jurisdiction with respect to rates, terms, and conditions for pole attachments in any case where such matters are regulated by a State. (2) Each State which regulates the rates, terms, and conditions for pole attachments shall certify to the [FCC] that—

(A) it regulates such rates, terms, and conditions; and

(B) in so regulating such rates, terms, and conditions, the State has the authority to consider and does consider the interests of the subscribers of cable television services, as well as the interests of the consumers of the utility services.

47 U.S.C. § 224(c) (1982).

In June 1985, the PSC attempted to wrest jurisdiction over pole attachment agreements away from the FCC. The PSC promulgated regulations to govern the rates, terms, and conditions of pole attachment agreements between utility companies and cable television companies. *See* COMAR 20.51.01 and .02.[1] The PSC then issued Order No. 67049,

---

1. COMAR 20.51.01 and .02 provide as follows:
   Chapter 01—General Regulations
   .01—Purpose.
      The purpose of this subtitle is to provide for the regulation of the rates, terms, and conditions for cable television use of existing electric or telephone company rights-of-way, including the use of existing utility poles, in accordance with Maryland law, federal law and, to the extent applicable, Federal Communications Commission rules and regulations.
   .02—Standards.
      The rates, terms, and conditions for cable television use of existing electric or telephone company rights-of-way, including the use of existing utility poles, shall be just and reasonable. In regulating rates, terms, and conditions in accordance with this subtitle, the

which certified to the FCC that the PSC regulated the rates, terms, and conditions of pole attachment agreements in Maryland and that it had authority to consider, and would consider, the interests of cable television subscribers.

The Maryland/Delaware Cable Television Association, Inc. (Association), a trade association for the cable television industry in Maryland and Delaware, challenged the validity of the PSC's regulations. The Association[2] brought a declaratory judgment action in the Circuit Court for Baltimore County under Maryland Code (1957, 1980 Repl. Vol., 1986 Cum.Supp.), Art. 78, § 89 against the PSC and a number of utility companies.[3] The complaint alleged

Commission shall consider the interests of both cable television subscribers and the customers of electric or telephone companies.
.03—Agreements for Use of Electric or Telephone Poles.

The rates, terms, and conditions for the use of electric or telephone company rights-of-way, including the use of existing utility poles, shall be established by an agreement between the electric or telephone company and the cable television company.
.04—Filing of Pole Attachment Agreements.

An electric or telephone company shall file with the Commission a copy of any pole attachment agreement with a cable television company for use of the electric or telephone company's poles.
Chapter 02—Complaints
.01—Pole Attachment Disputes.

If a cable television company and an electric or telephone company are unable to reach an agreement with respect to the rates, terms, and conditions for the use of electric or telephone rights-of-way, including use of existing utility poles, either party may file a petition requesting the Commission to resolve the dispute.
.02—Time for Taking Final Action.

With respect to any individual matter, the Commission shall take final action within 360 days after the filing of the complaint.

2. The following cable television companies also filed as plaintiffs in this action and are appellees in this appeal: Comcast Cablevision of Maryland, L.P., Chasco Cablevision, Ltd., Howard Cable Television Associates, Inc., Metrovision of Prince George's County, Inc., St. Charles CATV, Inc., Tribune-United of Montgomery County, United Cable Television of Baltimore, Inc., and United Cable Television of Eastern Shore, Inc. Hereafter, we shall use "Association" when referring to all appellees.

3. The following utility companies were named as defendants in this action and are appellants in this appeal: Baltimore Gas & Electric Company, Choptank Electric Cooperative, Inc., Delmarva Power &

that the promulgation of the regulations was beyond the PSC's statutory powers and thus did not satisfy the FCC's requirements for preempting federal jurisdiction. In its answer, the PSC asserted that the Public Service Commission Law (PSC Law), Maryland Code (1957, 1980 Repl. Vol., 1986 Cum.Supp.), Art. 78, gave the PSC authority to regulate pole attachment agreements. There was no genuine dispute as to any material fact and all parties therefore moved for summary judgment in their favor.

The circuit court granted summary judgment for the Association. The court found the PSC's regulations invalid on two independent grounds. First, the court concluded that the PSC did not have the statutory power to regulate the rates, terms, and conditions of pole attachment agreements. Second, the court found that the PSC did not have the statutory power to consider, and in fact may not have considered, the interests of cable television subscribers as required by the Act. The PSC appealed the circuit court's decision to the Court of Special Appeals, but we granted certiorari before consideration of the case by the intermediate appellate court.

On appeal, the PSC argues that §§ 56 and 68(a) of the PSC Law grant the PSC authority to regulate the rates, terms, and conditions of pole attachment agreements. The PSC also cites several sections of the PSC Law to support its position that the PSC has the power to consider the interests of cable television subscribers. The Association argues that the sections cited by the PSC are insufficient to grant the PSC the requisite power needed to regulate pole attachment agreements. We agree with the Association and hold that the PSC does not have the statutory authority to regulate pole attachment agreements. We explain.

---

Light Company, Potomac Electric Power Company, Southern Maryland Electric Cooperative, Inc., and Chesapeake & Potomac Telephone Company of Maryland. Hereafter, we shall refer to "PSC" when referring to all appellants.

■ The PSC is a legislatively created body and, thus, its powers are limited to those expressly or impliedly granted by statute. *Albert v. Public Serv. Comm'n,* 209 Md. 27, 34, 120 A.2d 346, 349 (1956); *accord Holy Cross Hosp. v. Health Serv. Cost Review Comm'n,* 283 Md. 677, 683, 393 A.2d 181, 184 (1978). The parties agree that the PSC Law does not grant the PSC power to *directly* regulate cable television companies or the *express* power to regulate a utility company's pole attachment agreements. Nevertheless, the PSC argues that §§ 56 and 68(a) give it the power to regulate the rates, terms, and conditions of pole attachment agreements.

We begin our discussion by examining § 56, which provides in pertinent part:

The [PSC] shall supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality....

The PSC argues that utility poles are integral to the operation of a utility company's business and that the attachment of cable television lines to utility poles may interfere with the reliability of utility service, public safety, and aesthetics. The PSC suggests that the presence of cable television lines and equipment on poles may interfere with the ability of utility company employees to repair and maintain utility wires on the same poles and that abuses of cable operators could potentially disrupt utility service. In addition, the PSC argues that without its regulation of pole attachment agreements, "the attachments might develop into a haphazard mesh on the skyline." The PSC therefore concludes that its regulations are valid under § 56.[4]

―――――――

4. The PSC also argues that the regulations are valid under § 73(a), which states in pertinent part:

■ We agree with the PSC that utility poles are essential to the delivery of telephone and electric service and that the PSC is empowered to regulate the use of such poles to ensure reliable service and to protect the public safety. Nevertheless, we fail to understand how the regulation of the *rates* of pole attachment agreements is necessary to ensure safe and reliable utility service to the public. Furthermore, we fail to perceive any relation between the price a cable television company pays to attach its cable to a utility pole and the "efficient delivery of utility services," "public safety," and "the preservation of environmental quality." We therefore conclude that § 56 does not give the PSC authority to promulgate COMAR 20.51.01 and .02, which regulate the rates set in pole attachment agreements.[5]

■ The PSC also argues that it has power to regulate the rates set in pole attachment agreements under § 68(a) of the PSC Law. That section grants the PSC "the power to determine just and reasonable rates of public service companies." Section 2(q) defines "rates" as "tolls, fares, tariffs, fees, prices and any other charges for *public utility services* ... and any schedule, regulation, classification or practice of any public service company affecting the amount of such charges." (Emphasis added). The PSC argues that because utility poles are essential to providing utility service and are a part of the utility company's plant, the rental of pole space for cable television wires is a "public utility

---

The [PSC] may by regulation ... prescribe standards of safe, adequate, reasonable, and proper service for any class of public service company, which in the [PSC's] opinion will best promote the security or convenience of the public....

We find that § 73 does not grant the PSC any greater powers, in this case, than does § 56. We shall therefore only discuss § 56.

5. At oral argument, the PSC stated that if the PSC's certification of jurisdiction to the FCC was not valid, then the FCC would preempt all regulations over pole attachment agreements, including regulations for public safety. We express no opinion as to whether the PSC could in the future promulgate regulations under §§ 56 and 73 to ensure public safety in the attachment of coaxial cables to utility poles.

service." The PSC therefore contends that it can regulate the rates charged for that service under § 68(a).

We disagree with the PSC's overly broad interpretation of the term "public utility service." The PSC was created in 1910 to supervise the essential public services provided by utility companies. 1910 Laws of Maryland, ch. 180. As we stated in *Public Serv. Comm'n v. Philadelphia Balto. & Wash. R.R.*, 155 Md. 104, 115, 141 A. 509, 514 (1928):

> The welfare, safety, and convenience of the public depended so closely upon the fair and efficient administration of corporations engaged in furnishing *transportation, light, power, water, sewage, and other sanitary facilities to the public,* that it became necessary to devise some agency by which they could be supervised and controlled in the exercise of their corporate functions and *in the use of the privileges granted to them by the State,* so as to insure the highest quality service commensurate with the compensation charged, and to secure a relation between service and rates fair alike to the corporation and the public.

(Emphasis added).

Although the PSC Law was revised and recodified by the 1955 Laws of Maryland, ch. 441, the purposes and duties of the PSC were not changed. *Baltimore Tank Lines v. Public Serv. Comm'n*, 215 Md. 125, 127–28, 137 A.2d 187, 189 (1957). Therefore, the PSC continues to be responsible for ensuring that the "users of [a] utility [are] insured of safe and adequate service at a reasonable price." *Miles v. Public Serv. Comm'n*, 151 Md. 337, 344, 135 A. 579, 582 (1926).

We find that "public utility services" are limited to those services that a utility company provides under "the privileges granted to [it] by the State." With regard to the utility companies involved in the instant case, the electric companies have franchises to produce and deliver electricity, while the telephone company has a franchise to provide telephonic service. Those are the "public utility services"

that the PSC must regulate to protect the public. Providing excess pole space for cable television line attachment is not a "public utility service." Instead, it is a "service" unrelated to a utility company's primary function.

■ At oral argument, the PSC conceded that if an electric company owned an office building, part of which it used and part of which it leased to a private business, the rental of that office space would not be a "public utility service," and the PSC would have no power to regulate the lease. We find the rental of unused pole space by an electric company to a cable television company to be indistinguishable. Both rentals involve the electric company's attempt to turn unused portions of its plants into additional revenue by providing a service unrelated to its primary function, i.e., providing electricity. Moreover, neither the leasing of the office space nor the leasing of pole space is a service provided by the utility company pursuant to its privileges granted by the State. Finally, we note that the use of utility poles for the suspension of cable television lines is not an essential service provided to the entire public, but is instead an incidental service provided to only a few private parties. Consequently, it is not a "public utility service." *Cf. Public Serv. Comm'n v. Howard Research & Development Corp.,* 271 Md. 141, 314 A.2d 682 (1974) (The PSC has the power to regulate *public* services but does not have the power to regulate *private* sales of electricity.). Simply put, we find the PSC's ratemaking power permits the PSC to set reasonable rates for public utility services such as the distribution of electricity or the sale of telephonic communications, but not for ancillary or miscellaneous business activities unrelated to the utility company's franchise right and duty to provide utility service. We therefore hold that the rental of pole space for cable attachments is not a "public utility service" over which the PSC has ratemaking authority under § 68(a). *Accord American Cable Television, Inc. v. Arizona Pub. Serv. Co.,* 143 Ariz.App. 273, 278, 693 P.2d 928, 933 (1983) ("We believe that the clear purpose of [the Arizona Public Service

Law] is to enable the Commission to review for fairness the rates a public utility charges its customers for public utility services.... However, we do not find that pole attachment licenses granted by [a utility company] are public utility services."); *Illinois—Indiana Cable Television Assoc., Inc. v. Public Serv. Co.*, 427 N.E.2d 1100, 1108–11 (Ind.App. 1981) (The rental of excess pole space by a utility company is not a "service" that may be regulated by the state public service commission.).

The PSC also contends that there is a second source in § 68(a) for its power to regulate the rates charged in pole attachment agreements. To reiterate, § 68(a) empowers the PSC to determine the rates charged by public service companies and § 2(q) includes in its definition of "rates," any "practice of any public service company affecting the amount of such charges." The PSC argues that a utility company's "practice" of leasing pole space for cable attachments "affect[s] the amount of ... charges" assessed against the utility company's utility customers. The PSC maintains that if a cable television company leases pole space for a fee less than its fair share of the cost and maintenance of the pole, then the utility company's customers will be required to pay higher rates and, in essence, subsidize cable television subscribers.

We again find that the PSC's interpretations of §§ 68(a) and 2(q) are too expansive. Under the PSC's theory, nearly any activity carried on by a utility company could be considered a "practice" affecting charges for utility services. This argument is similar to the argument made by the PSC in *Public Serv. Comm'n v. Sun Cab Co.*, 160 Md. 476, 154 A. 100 (1931). In that case, the Sun Cab Company challenged the validity of a PSC regulation requiring the company to carry public liability insurance on the cabs it operated. The PSC acknowledged that it did not have express statutory power to require cab owners to take out indemnity insurance, but argued that it did have express power to

regulate the "practices ... of any common carrier" to ensure that they were not unsafe. *Id.* at 478–79, 154 A. at 101. The Court defined "practices" as follows: " '[T]he action of doing something; performance, execution; working, operation; method of action. A habitual way or mode of action; a habit; something done constantly or usually; a habitual action.' " *Id.* at 482, 154 A. at 103 (quoting The Oxford Dictionary). The Court then concluded:

> In none of these [definitions] do we see any meaning or interpretation ascribed to the word from which it might be inferred that the "practices" of a public utility or carrier have to do with anything except its physical operations which have been, or, after an order of the [PSC], would become, customary and usual.
>
> We cannot, therefore, justify the action of the [PSC] on the ground that it is or would be one of the "practices" intended by the statute....

*Id.*

██ Similarly, we find that the leasing of excess pole space for cable television line attachments is not a "practice" that may be regulated by the PSC. Granting pole attachment rights is unrelated to the customary and usual physical operations of a utility plant. Moreover, the PSC conceded at oral argument that not all contracts entered into by a utility company are "practices" within the meaning of § 2(q). Specifically, the PSC admitted that it could not regulate the rates in repair contracts between utility companies and private companies because there would be an insufficient nexus between the repair contract and the utility company's status as a public utility company. We find the lease of pole space to be analogous, and, as we stated above, do not think § 68 was intended to give the PSC plenary power over every aspect of a utility company's operations. Entering a pole attachment agreement is far removed from providing utility service and is not the kind of "practice" that the PSC has power to regulate.

Finally, the PSC cites several cases from other states that have ruled on the question of whether the public service commission in its jurisdiction has authority to regulate pole attachment agreements.[6] The resolution of those cases, however, turned on the underlying statutory grants of power to the particular public service commission. Likewise, the instant case turns on the powers granted to the PSC under the PSC Law. Consequently, we do not find the decisions from courts of other jurisdictions helpful.

■ In sum, we hold that the PSC exceeded its power in promulgating COMAR 20.51.01 and .02 and in certifying to the FCC that the PSC has jurisdiction to regulate the rates, terms, and conditions of pole attachment agreements. We therefore find both the regulations and the certification to the FCC invalid. Because we reach this result, we need not examine whether the circuit court was correct in holding that the PSC lacks the power to consider the interests of cable television subscribers.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.

---

**6.** Four state courts have found that the public service commission in its state does not have jurisdiction over pole attachment agreements. *American Cable Television, Inc. v. Arizona Pub. Serv. Co.,* 143 Ariz. App. 273, 693 P.2d 928 (1983); *Teleprompter Corp. v. Hawkins,* 384 So.2d 648 (Fla.1980); *Illinois-Indiana Cable Television Ass'n, Inc. v. Public Serv. Comm'n,* 427 N.E.2d 1100 (Ind.App.1981); *In re New England Cable Television Ass'n,* 489 A.2d 124, 126 N.H. 149 (1985). Seven state courts have found that the public service commission in its state has jurisdiction over pole attachment agreements. *Cable Television Co. v. Illinois Commerce Comm'n,* 82 Ill.App.3d 814, 38 Ill.Dec. 199, 403 N.E.2d 287 (1980); *Kentucky CATV Ass'n v. Volz,* 675 S.W.2d 393 (Ky.App.1983); *cert. denied,* (1984); *Louisiana Cablevision v. Louisiana Pub. Serv. Comm'n,* 493 So.2d 555 (La.1986); *Consumers Power Co. v. Telesystems, Inc.,* 96 Mich.App. 1, 292 N.W.2d 472 (1980); *Las Cruces TV Cable v. New Mexico Corp. Comm'n,* 102 N.M. 720, 699 P.2d 1072 (1985); *General Tel. Co. v. Public Serv. Comm'n,* 63 A.D.2d 93, 406 N.Y.S.2d 909 (1978); *Utah Cable Television Operators Ass'n, Inc. v. Public Serv. Comm'n,* 656 P.2d 398 (Utah 1982).